

## NUMBER 13-23-00032-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

### IN THE INTEREST OF R.R.G. IV, A CHILD

---

On appeal from the County Court at Law No. 5
of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Benavides**

Appellants A.A.N.P. (Alexis) and R.G. III (Ryan)[1] appeal from the trial court's final

order terminating their parental rights to R.R.G. IV (Roger). Alexis and Ryan both argue

that the trial court's jurisdiction was extinguished when it failed to render an order

extending the automatic dismissal date prior to the deadline lapsing. *See* TEX. FAM. CODE

ANN. § 263.401(b). Alexis additionally argues that the trial court erred by: (1) terminating

---

[1] We identify the parties and child in this case by aliases. *See* TEX. R. APP. P. 9.8(b)(2).

her parental rights when the evidence was legally and factually insufficient to show that it was in Roger's best interest; and (2) denying her motion for new trial based on newly discovered evidence.[2]  We affirm.

## I.  PROCEDURAL BACKGROUND

On May 10, 2021, the Texas Department of Family and Protective Services (the Department) filed an original petition for the protection of Roger and to terminate the parental rights of Alexis and Ryan. According to the affidavit in support of removal attached to the petition, the Department received a report of potential child neglect on May 4, 2021. As part of its preliminary investigation, the Department learned that Roger was born testing positive for methylenedioxymethamphetamine (MDMA), amphetamine, and benzodiazepine. Alexis submitted to a urinalysis test, which yielded positive results for methamphetamine.

That same day, the trial court signed an order removing the child from the parents' custody and appointing the Department as temporary managing conservator. Throughout the course of the proceedings, Alexis was permitted two-hour supervised visits with Roger twice weekly. On May 16, 2022, the trial court signed an order requiring Alexis to complete inpatient drug treatment.

Trial commenced on November 7, 2022. At the conclusion of trial, the court took the matter under advisement. On December 28, 2022, the trial court signed an order terminating Alexis's and Ryan's parental rights and finding that the termination was in Roger's best interest. Alexis filed a motion for new trial based on newly discovered

---

[2] We have renumbered Alexis's issues.

2

evidence, but the trial court denied the motion. This accelerated appeal followed. *See* TEX. R. APP. P. 28.4.

## II.   JURISDICTION

Alexis and Ryan contend that the trial court lost jurisdiction over the termination proceedings by failing to extend the automatic dismissal deadline.

## A.   Standard of Review & Applicable Law

"Before a court may enter judgment against a party, the court must have obtained jurisdiction over that party pursuant to applicable rules or statutes." *Whatley v. Walker*, 302 S.W.3d 314, 321 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). A judgment is void when the court rendering judgment had no jurisdiction over the parties or property, no jurisdiction over the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act. *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020). We review whether a trial court has jurisdiction de novo. *Joyner v. Joyner*, 352 S.W.3d 746, 749 (Tex. App.—San Antonio 2011, no pet.).

"Section 263.401 of the Texas Family Code establishes a deadline for rendition of a final order in suits affecting the parent-child relationship (SAPCRs) brought by the [Department]." *In re Tex. Dep't of Fam. & Protective Servs.*, 210 S.W.3d 609, 611 (Tex. 2006) (orig. proceeding) (op. on reh'g). This provision requires trial courts to commence a trial on the merits by "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." TEX. FAM. CODE ANN. § 263.401(a). If the trial court finds certain extraordinary circumstances exist, the statute allows the trial court to extend the deadline

3

by a maximum of 180 days. *Id.* § 263.401(b); *In re Tex. Dep't of Fam. & Protective Servs.*, 210 S.W.3d at 612. "But if the trial court neither commences trial by the dismissal date nor extends it in accordance with [§] 263.401(b), the statute dictates a dire consequence: the trial court's jurisdiction over the suit 'is terminated and the suit is automatically dismissed.'" *In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021) (quoting TEX. FAM. CODE ANN. § 263.401(a)).

**B.    Analysis**

On May 10, 2021, the trial court rendered a temporary order appointing the Department as temporary managing conservator. This made the automatic dismissal date May 16, 2022. *See* TEX. FAM. CODE ANN. § 263.401(a). At a docket call on May 5, 2022, the Department and counsel for Alexis informed the trial court that the automatic dismissal deadline was looming and that the trial court had not extended the deadline yet. Counsel for Ryan announced that he was not ready for trial. Counsel for Alexis discussed her client's attempts to begin inpatient drug treatment and stated the case "need[ed] an extension." The trial court pronounced, "Okay. I'll order the [263.]401 [extension], but let's set it for trial. If she gets into treatment—I mean, that's the goal here. . . . If she's in treatment in 45 days, my inclination will be to let her finish her treatment." However, the trial court failed to explicitly make the findings mandated by § 263.401(b). *See id.* § 263.401(b). No party objected to the trial court's oral rendition of the extension or its omission of the required findings. *See* TEX. R. APP. P. 33.1(a). On May 27, 2022, the trial court signed a written order setting the new dismissal date as November 13, 2022, and explicitly finding "that extraordinary circumstances necessitate the subject child[

4

]remaining in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the subject child." *See* TEX. FAM. CODE ANN. § 263.401(b).

We conclude the trial court's pronouncement that it would "order the [263.]401 [extension]" was sufficient to extend the mandatory dismissal deadline. *See id.* § 101.026; *In re G.X.H.*, 627 S.W.3d at 299 (explaining that Texas Family Code § 101.026 "permits trial courts to render orders orally in the presence of the court reporter"); *see also In re J.P.*, No. 13-18-00648-CV, 2020 WL 103858, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 9, 2020, pet. denied) (mem. op.) (holding that the trial court rendered judgment when it stated, "The Court will approve the agreement of the parties and I will order the release of [Mother]"). However, both Alexis and Ryan urge that because the trial court failed to explicitly make the findings required by § 263.401(b) prior to the expiration of the original dismissal deadline, the trial court's attempt to extend the deadline was ineffective. *See* TEX. FAM. CODE ANN. § 263.401(b).

"[T]rial courts must expressly make the 'extraordinary circumstances' and 'best interest' findings" required by § 263.401(b) "either in a written order or orally at a hearing, and their failure to do so is error." *In re J.S.*, No. 22-0420, 2023 WL 4036262, at *7 (Tex. June 16, 2023). But "a trial court's failure to make the mandatory [§] 263.401(b) findings expressly does not affect the separate jurisdictional inquiry." *Id.* at *9; *see id.* at *12 (concluding that "a trial court's failure to make the mandatory 'extraordinary circumstances' and 'best interest' findings prior to the initial automatic dismissal deadline is a non-jurisdictional error"). Accordingly, the failure of the trial court to explicitly make

5

the findings required by § 263.401(b) prior to the original dismissal deadline did not deprive the trial court of jurisdiction. *See In re J.S.*, 2023 WL 4036262, at *12. Further, because Alexis and Ryan did not object below to the trial court's failure to explicitly make the required findings prior to the original dismissal deadline, any other complaints they raise concerning this issue were not preserved for our review. *See id.* ("Because Mother did not object to the trial court's failure to comply with the non-jurisdictional findings requirement prior to the initial automatic dismissal deadline, that error cannot be addressed for the first time on appeal."); *see also* TEX. R. APP. P. 33.1(a).

We overrule Ryan's sole issue and Alexis's first issue.

### III. BEST INTEREST OF THE CHILD

In her second issue, Alexis argues that the evidence was legally and factually insufficient to find that termination of her parental rights was in Roger's best interest.

### A. Applicable Law

"A parent's right to 'the companionship, care, custody, and management' of her children is a constitutional interest 'far more precious than any property right.'" *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). "Because the natural right between a parent and his child is one of constitutional dimensions, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). "In parental termination cases, due process requires application of the clear and convincing standard of proof." *Id.* "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind

6

of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

To terminate parental rights, a court must find one of the grounds for termination specified in § 161.001(b)(1) of the family code and that termination is in the best interest of the child. *Id.* § 161.001(b)(1), (2).[3] "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In determining the best interest of the child, courts may consider the following non-exhaustive factors:

(1)    the desires of the children;

(2)    the emotional and physical needs of the child now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individuals seeking custody;

(5)    the programs available to assist these individuals to promote the best interest of the child;

(6)    the plans for the children by the parents;

(7)    the stability of the home or proposed placement;

(8)    the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one; and

---

[3] Alexis's parental rights were terminated on the grounds that she: (1) knowingly placed or allowed Roger to remain in conditions or surroundings which endangered his physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered Roger's physical or emotional well-being, *id.* § 161.001(b)(1)(E); (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain Roger's return and that Roger had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of Roger's removal from Alexis because of the abuse or neglect of Roger, *id.* § 161.001(b)(1)(O); and (4) used a controlled substance, as defined by Chapter 481 of the health and safety code, in a manner that endangered the health or safety of the child, and either failed to complete a court-ordered substance abuse treatment program or after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance, *see id.* § 161.001(b)(1)(P). Alexis does not challenge the sufficiency of the evidence to support these grounds.

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). However, there is no requirement that the trial court hear evidence concerning each of the *Holley* factors, and the trial court is permitted to consider additional factors in determining a child's best interest. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (citing *Holley*, 544 S.W.2d at 371–72). "While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child." *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). In child protection cases brought by the Department, there is also a presumption that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307.

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* If, after this review of the evidence, we determine "that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true," then the evidence is legally insufficient. *Id.*

"In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence." *In re*

8

*L.C.L.*, 599 S.W.3d 79, 84 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc). The appropriate inquiry is "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "Because the factfinder 'is the sole arbiter of the witnesses' credibility and demeanor,' appellate review must defer to the trial court's factual determinations, even in parental termination cases." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (footnotes omitted).

## B. Evidence

At the final hearing, the following evidence was presented:

### 1. Kennedy Toungate's Testimony

Kennedy Toungate, a caseworker for the Department, testified that Roger was removed at birth because both he and Alexis tested positive for "ecstasy, opiates, methamphetamine, amphetamines, and benzodiazepine." Toungate explained that a family service plan was created, and that as part of this plan, Alexis was required to complete parenting classes, individual therapy, psychological and psychosocial assessments, and a drug assessment. Alexis was also required to submit to random drug screenings and to allow a Department representative access to her home.

Alexis was allowed supervised visits with Roger, and Toungate opined that these visits had "gone fairly well" with Alexis behaving "pretty age appropriate[ly,] aside from maybe giving [Roger] a bottle when he's no longer on the bottle, and . . . one time where she lunged at me with the child in her arms. But other than that, she's been appropriate." Toungate expanded on this incident, explaining that Alexis "picked up the child, she

lunged at me, and she was calling me—she was calling me names while holding the child in her hands." Alexis told Toungate "that she would not be handing the child over to [Toungate] after that visitation was over and that [Toungate] would need to call law enforce[]ment, which [Toungate] did." Toungate believed this behavior was "not safe for a child."

Toungate agreed that Alexis had completed her individual counseling. Alexis also "completed drug courses in October of 2021," but Alexis then relapsed on methamphetamine, and the Department recommended she enroll in a relapse prevention program. Alexis did not do so. Toungate testified that the Department would also "ask [Alexis] to drug test once a week, once every other week, and she—most of the times, she would not drug test." Toungate explained that "the Department offered to take her and even set up transportation for her and she did not complete those tests." Toungate added that the last time Alexis completed a drug test for the Department was August 19, 2022, despite asking Alexis to test every week between then and November 3, 2022. Toungate also explained that she was not able to testify to the safety of Alexis's residence, as she had not been able to personally examine Alexis's living arrangement.

According to Toungate, Alexis would confirm that she was going to begin inpatient treatment "[e]very week." However, Toungate confirmed that Alexis "has not completed inpatient rehab as ordered by the Court." Toungate outlined Alexis's attempts at obtaining inpatient treatment as follows:

> I do know that she went to Santa Maria in Houston for a few days and then left. I do know that she attended Outcomes Recovery in Brownsville in June. She left [due] to a family emergency and then went back once her family emergency was completed and then left against recommendation. And then

10

she went to Outcomes as well, I believe, in September after I became the caseworker. She was there for a few days and then left against recommendation again.

Toungate testified that Alexis "left Laurel Ridge against medical advice," as well.

Toungate also explained that Alexis's mental health "has been a concern," and Alexis has not adequately addressed the issue. Toungate did not "believe that [Alexis] would be able to be a safe parent" because of her unaddressed mental health issues. According to Toungate,

[w]e started this group message at the beginning of September, just due to [Alexis] both texting myself and my supervisor anywhere from 20 to 70 times in a day after we addressed her concerns with her numerous times. So, we hoped that that would help regulate some of those messages and some of her concerns, which it didn't. I still received text messages calling me, I quote, stupid fucking bitch weekly. So, it's very erratic explosive behavior.

Toungate agreed that the Department was recommending the termination of Alexis's parental rights.

### 2. Desiree Villarreal's Testimony

Desiree Villarreal, Alexis's sister, testified that she was Roger's current caregiver. According to Villarreal, Roger was originally placed with her on June 16, 2021, when he was seven weeks old. Villarreal testified that she had not known of Alexis's pregnancy until close to Roger's date of birth, and that from her observations of Alexis, Villarreal suspected Alexis was "using" around that time, but she was not certain.

Villarreal explained that when Roger was first placed with her, she wanted her sister to "[g]o to rehab to get clean so she could possibly get him back." During this initial period, Villarreal and Alexis had a good relationship. However, around the time Roger was "four to six months old," things soured between the siblings. Villarreal described

11

Alexis's communications as "not violent, but ugly." For instance, Villarreal said that Alexis texted her that "she hates [her]," and "at one point, [Alexis] told [Villarreal] . . . [t]hat she was going to basically, unfortunately, stalk [Villarreal] if that's what it took for her to be able to see her son."

Villarreal explained that she believed it was in the child's best interest "[t]o stay where he's at." Villarreal explained that Roger was "happy" and "thriving." But Villarreal also testified to some of the specialized health and developmental care Roger needed. She explained that Roger "was evaluated for physical therapy in October and he just started it, like, the second-to-last week of November and his physical therapy goal was to start walking. . . . He is now walking. He is almost running now." Roger also "started occupational therapy at ten months old" because "[h]e did have a slow development with motor skills and verbalizing as well," but that "[a]ll the milestones that [were] set for him, he hit." Roger also attended "specialized skills training," which "helps [Roger] to produce environmental sounds such as, like, vehicle[ and] animal noises to help him speak more." Roger was also diagnosed with asthma, which requires the use of a "Symbicort inhaler twice a day. Two pumps in the morning, two pumps at night," and occasionally necessitates the use of "an oral steroid." Villarreal testified that if those interventions did not work, "it's to the ER we go."

Villarreal testified that she was in school to be a registered nurse and planned to finish her degree in December of 2023. She sometimes picked up contract work at a drug and genetic testing company, as well. Villarreal also testified that she was caring for four children of her own. Villarreal testified that she did not "want to take [Roger] from [her]

12

sister," but she believed it was in Roger's best interest for Alexis's parental rights to be terminated. She also testified that her goal was to move forward with kinship adoption.

### 3. Alexis's Testimony

Alexis testified via Zoom over the course of two days. On the first day, she was on her way to an inpatient drug treatment facility called "The Right Step in Wimberley, Texas." On the second day, she testified from the facility.

Alexis gave conflicting testimony concerning her drug use. She agreed that she had an issue with drugs beginning in 2008, and that she had never sought treatment prior to the initiation of this case. According to Alexis, her "baby was positive for a benzo" because "[t]hey gave [her] that in [her] IV when [she] was having [her] C-section." Alexis acknowledged the "MDMA" in Roger's system when he was born "came from the line of meth . . . . ingested by [her]." However, she later testified that she "didn't take methamphetamines when [she] was pregnant." Alexis admitted that she had continued to use meth over the course of the proceedings, and that the date she last used meth was June 20, 2022. However, she also claimed that she just "said that [she] used meth to get into rehab," and that she was actually clean and could not recall the last time she used drugs. Alexis acknowledged that her "baby being born positive . . . clearly shows that [she is] an addict." However, she also testified that she was "not a frequent user of meth" and expressed confusion as to why she "didn't bring [her] baby home" from the hospital.

Alexis acknowledged that she "[p]robably" missed at least three drug tests between July 30 and November 8, 2021. She also agreed she "wasn't drug testing all of the month" of December 2021. According to Alexis, in the months leading up to March of 2022, she

13

"had tested. Not every single time, but [she] had tested and [her] UA was negative." However, when she missed drug tests, it was either "because [she] didn't have transportation or [she] was at work." She testified that she would get rides from "[s]ome friends" or from her father as "one of the last resorts," but that she would often have to take taxis which would always cost "over $100." Alexis testified that "the Department didn't lend a hand to help [her] complete [her] services."

According to Alexis, on May 12, 2022, she "was getting admitted to Santa Maria in Houston" for inpatient treatment. She then "found Outcomes in the Valley and they accepted [her], but right before then, before June 20[], [she] had found Starlite Recovery." Alexis testified that she "was at Outcomes for a week[ but l]eft in an emergency." Alexis testified that she was then admitted to San Antonio Recovery, but that she "had an altercation with another person," and was then transferred to Laurel Ridge. Alexis stated that she would complete inpatient treatment at The Right Step, regardless of the outcome of the termination proceedings.

Alexis testified that she worked as "a private nurse." She was paid $20 per hour in cash and worked "about 25 hours a week, but, sometimes they need [her] more than that." However, Alexis also testified, "I quit. I closed down my business and I have no more money." Alexis testified that she lived with her father, and that a previous Department caseworker had approved the residence. After completing treatment, she planned to continue living with her father or to live with one of her adult children. She also testified that several people, including her father and her adult children, were willing to act as 24-hour monitors, so she could have increased supervised visits with Roger. Alexis

14

denied having any mental health issues, other than an ADHD diagnosis.

Alexis testified that she did "not want to take [her] sister away from [Roger]." According to Alexis, "that's the mother that he knows because I've been kept away from my son." However, Alexis also stated that "he's my baby," and "[h]e needs to be with his mother."

## C.     Best Interest Analysis

### 1.      Desires of the Child

The first *Holley* factor takes into account the child's desires. *See Holley*, 544 S.W.2d at 372. Roger was sixteen months old at the time of the final hearing. "When children are too young to express their desires, the factfinder may consider whether the children have bonded with the [placement], are well-cared for by them, and have spent minimal time with a parent." *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Here, Villarreal testified that Roger was placed with her since he was seven weeks old. Toungate testified that Roger was "doing well" in his current placement, and that Villarreal and Roger "have a really good bond." Alexis acknowledged the bond between Villarreal and Roger, stating, "that's the mother that he knows."

On the other hand, Alexis was awarded two-hour supervised visits twice a week with Roger. By all accounts, Alexis would, for the most part, behave appropriately at these visits. She would bring toys, books, diapers, food, etc. Toungate testified that Roger and Alexis "have a very good relationship." This factor weighs slightly against terminating Alexis's parental rights. *See id.*

15

### 2. Emotional and Physical Needs of and Danger to Roger, Now and in the Future

"The need for permanence is a paramount consideration for a child's present and future physical and emotional needs." *In re J.G.S.*, 550 S.W.3d 698, 705 (Tex. App.—El Paso 2018, no pet.). "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *In re R.A.G.*, 545 S.W.3d 645, 651 (Tex. App.—El Paso 2017, no pet.).

A "factfinder can give 'great weight' to the 'significant factor' of drug-related conduct." *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). And "[a] fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *In re G.C.S.*, 657 S.W.3d 114, 134 (Tex. App.—El Paso 2022, pet. denied).

Alexis offered a variety of explanations for why three drugs were found in Roger's system at his birth. As to amphetamines, she testified, "I'm saying I didn't take methamphetamines when I was pregnant. I took Adderall and my OB doctor knew that." As to benzodiazepines, she testified, "[Y]ou tell me my baby is dirty with three drugs. One of them is a benzoid and that's when the anesthesiologist gave me Percocet. I didn't put my baby in the NICU. The Percocet put the baby in the NICU." As to MDMA, she stated, "I was very concerned that somebody was giving me something and how [sic] my baby

16

was positive for MDMA." We will not "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003). The trial court could have disbelieved Alexis's testimony and instead determined that Roger was born with these illicit substances in his system not because of the medical care Alexis received or because someone was drugging her, but because of her own prior, unlawful drug use. *See id.*; *In re J.J.L.*, 578 S.W.3d 601, 611 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("A parent's unwillingness to admit she has a substance abuse problem suggests she will continue to abuse drugs and therefore continue to endanger her child.").

Villarreal testified to Roger's special needs, both because of developmental delays and because of his young age. Villarreal testified that Roger: (1) required occupational therapy "two times a month," (2) required specialized skills training "four times a month," (3) "sees pulmonology regularly" and "does a Symbicort inhaler twice a day" for his asthma, and (4) requires physical therapy. Villarreal testified that Roger "has a routine" and that "[h]e's thriving." *See In re J.G.S.*, 550 S.W.3d at 705.

Alexis provided no testimony regarding how she would be able to transport Roger to his various therapies. Instead, she testified that she was unaware of most of Roger's needs, stating, "My child is always sick. I didn't even know my kid had asthma. Then my son can't walk or talk right now. I didn't even know what therapies he's getting." *See* TEX. FAM. CODE ANN. § 263.307(12)(F) (providing court may consider whether parent has an understanding of the child's needs and capabilities in determining whether the parent is willing and able to provide the child with a safe environment); *In re L.G.R.*, 498 S.W.3d at

17

206 ("The record evidence about the Child's medical needs weighs in favor of the trial court's finding that termination is in the best interest of the Child.").

Toungate expressed concerns over Alexis's "erratic explosive behavior" and her lack of cooperation with the Department. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (providing that a parent's willingness "to cooperate with and facilitate an appropriate agency's close supervision" is an appropriate consideration in determining the child's best interest). Toungate also recounted an incident where Alexis "lunged" at Toungate while Alexis was holding Roger. Given the specialized care Roger needs and the evidence concerning Alexis's inability to safely provide for those needs, these factors weigh in favor of termination.

### 3. Parenting Abilities and Programs Available

The fourth and fifth factors concern the parenting abilities of and the programs available to the individuals seeking custody. *See Holley*, 544 S.W.2d at 372. Alexis's continued drug use over the course of the proceedings, her failure to timely complete inpatient treatment, and her failure to submit to random drug testing per her service plan are all factors that indicate Alexis does not have the parenting abilities to adequately care for Roger. *See In re J.M.T.*, 519 S.W.3d 258, 271 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("[G]iven his illegal drug use, failure to complete services, and his failure to maintain contact with [the child] during the suit, the trial court could have reasonably inferred that Father did not have the necessary parental abilities to care for a young special-needs child."); *see also In re S.W.W.*, No. 14-22-00503-CV, 2022 WL 17982904, *12 (Tex. App.—Houston [14th Dist.] Dec. 29, 2022, no pet.) (mem. op.) ("Based on

18

Father's inability to achieve and maintain sobriety, the trial court reasonably could have found that Father's parental abilities weighed in favor of finding termination was in Sam's best interest."). Further, the trial court could have concluded that because Alexis was unable to comply with her drug testing because of transportation issues, she would also have difficulty ensuring Roger attended his necessary medical appointments. *See In re J.M.T.*, 519 S.W.3d at 270 ("A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of [her] child that [s]he does not have the ability to motivate [her]self to seek out available resources needed now or in the future.").

These factors weigh in favor of termination.

### 4. Plans for the Child and Stability of the Home

"The fact finder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined." *In re U.G.G.*, 573 S.W.3d 391, 403 (Tex. App.—El Paso 2019, no pet.). Toungate testified that Roger is well-cared for by Villarreal and Villarreal testified that she plans to move forward with adoption. Alexis testified that she had offers to continue living with her father or to move in with one of her adult children. Toungate was not able to testify to the safety of Alexis's father's home, as she had not been able to personally examine it. However, Alexis testified that a prior Department caseworker had approved Alexis's father's home.

Alexis discussed the possibility of having a 24-hour monitor with her so that she could have increased supervised visitation with the child. However, the trial court could

have disbelieved her testimony in this regard. *See In re J.F.-G.*, 627 S.W.3d at 312. Moreover, progressing from having two-hour supervised visits at a public facility twice a week to having the child with her at all times, albeit supervised by a friend or family member, is not necessarily realistic. *See In re U.G.G.*, 573 S.W.3d at 403*.* Alexis also did not explain how she would be able to support the child or how she would transport him to or from his necessary appointments. *See In re J.M.T.*, 519 S.W.3d at 270. After comparing Alexis's plan with that of the Department and Villarreal, the trial court could have found that Villarreal will be able to offer Roger the permanency and stability that he would not be able to have with Alexis. These factors weigh in favor of termination.

### 5. Acts or Omissions and Excuses Therefor

The eighth and ninth factors deal with any acts or omissions on the part of a parent that may indicate the existing parent-child relationship is not a proper one, and whether there are any excuses for those acts or omissions. *See Holley*, 544 S.W.2d at 372. Drug or alcohol abuse can be considered an act or omission that constitutes a threat of significant impairment to the child. *In re S.T.,* 508 S.W.3d at 492. Additionally, "[a] factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). According to Alexis, she would miss drug tests "because [she] didn't have transportation or [she] was at work." Alexis maligned the Department for not helping her with getting transportation to and from the drug tests. However, Toungate testified that "the Department offered to take her and even set up transportation for her and she did not complete those tests." The trial court was entitled to believe Toungate and disbelieve

Alexis. *See In re J.F.-G.*, 627 S.W.3d at 312.

Alexis also acknowledged that she was a drug addict stating, "My baby being positive, yes, that clearly shows that I'm an addict." Alexis testified that she "did a line of meth" on June 20, 2022, after she had been court-ordered to attend inpatient treatment. And although she later testified that she was actually clean and had difficulty being admitted into treatment because of this, the trial court could have resolved this disputed evidence against her. *See id.*; *In re S.T.*, 508 S.W.3d at 492.

Although Alexis was in an inpatient facility on the second day of her testimony, "[t]he trial court may reasonably decide a parent's changes before trial are too late to impact the best-interest decision." *In re J.J.L.*, 578 S.W.3d at 612. "Although a reasonable fact finder could look at Mother's attempts at sobriety and decide they justified the risk of keeping her as a parent, we cannot say the trial court acted unreasonably in finding [Roger's] best interest lay elsewhere." *Id.* Further, in a legal sufficiency challenge, we do not attribute "greater weight to [a parent's] recent improvements and less to [her] past challenges." *In re J.O.A.*, 283 S.W.3d at 346. These final factors weigh in favor of termination.

In conducting our legal and factual sufficiency review, we observe that eight of the nine *Holley* factors weigh in favor of the trial court's finding that termination was in Roger's best interest. This evidence was legally and factually sufficient to support the trial court's finding. *See In re J.M.T.*, 519 S.W.3d at 268. We therefore overrule Alexis's second issue.

### IV.    MOTION FOR NEW TRIAL

Finally, Alexis contends the trial court abused its discretion by denying her motion

for new trial based on newly discovered evidence—namely, that after trial concluded, Alexis successfully completed her inpatient treatment.

## A.     Standard of Review

A party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted.

*Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). In custody cases, "the newly-discovered evidence must strongly show that the original custody order would have a serious adverse effect on the interest and welfare of the child and that presentation of that evidence at another trial would probably change the result." *In re K.L.R.*, 162 S.W.3d 291, 311 (Tex. App.—Tyler 2005, no pet.). We review the denial of a motion for new trial for an abuse of discretion. *Waffle House, Inc.*, 313 S.W.3d at 813.

## B.     Analysis

Trial concluded in this case on December 2, 2022. At the hearing on Alexis's motion for new trial, she introduced as evidence a certificate from The Right Step which indicated that she had successfully completed "The Promises Right Step RTC Program" on December 27, 2022. Alexis continued to maintain at the hearing that she "finished all [her] services back in October" of 2021. However, Alexis also recognized that she had been admitted to inpatient treatment facilities on at least four occasions prior to trial but failed to complete those programs for one reason or another.

The Department argues that Alexis's evidence cannot support a new trial because it is newly created evidence rather than newly discovered evidence. Some of our sister

courts have held that "evidence not in existence prior to judgment cannot support a new trial." *See Banker v. Banker*, 517 S.W.3d 863, 878 (Tex. App.—Corpus Christi–Edinburg 2017, pet. denied) (collecting cases); *Sifuentes v. Tex. Employers' Ins. Ass'n*, 754 S.W.2d 784, 787 (Tex. App.—Dallas 1988, no writ) ("Sifuentes' evidence fails in one obvious respect. Even with due diligence, the evidence could not have been discovered prior to trial because prior to trial it did not exist."); *see also In re C.Y.C.*, No. 14-11-00341-CV, 2012 WL 3223674, at *20 (Tex. App.—Houston [14th Dist.] Aug. 9, 2012, pet. denied) (mem. op.) ("Mother's evidence constitutes new evidence rather than newly discovered evidence; this evidence does not satisfy the burden that must be met to obtain a new trial on the ground of newly discovered evidence."); *Martin v. Martin*, No. 09-94-370CV, 1995 WL 599023, at *5 (Tex. App.—Beaumont Oct. 12, 1995, no pet.) (mem. op.) ("The reason for granting a new trial on the grounds of newly discovered evidence is exactly what the name implies: evidence has been 'newly discovered' rather than newly created.").

However, we have not adopted a similar blanket rule. *See Banker*, 517 S.W.3d at 878–80 (declining to adopt the rule that new evidence does not constitute newly discovered evidence and instead holding that the new evidence was cumulative). And we need not adopt such a rule here, as Alexis has failed to meet her burden to show that "the evidence is not cumulative" and that "the evidence is so material it would probably produce a different result if a new trial were granted." *See Waffle House*, 313 S.W.3d at 813.

"[A] child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in determining best interest."

23

*In re J.L.C.*, 582 S.W.3d 421, 432 (Tex. App.—Amarillo 2018, pet. ref'd). It was within the trial court's discretion to determine that Roger's need for permanence outweighed the progress demonstrated by Alexis's completion of inpatient treatment after trial was completed. *See id.* Additionally, Alexis testified that, regardless of the outcome of the termination hearing, she would complete the inpatient drug treatment in which she was then-enrolled. Thus, the "evidence of post-trial events was cumulative of [Alexis's] well-developed projections at trial." *Banker*, 517 S.W.3d at 879. Finally, although the discovery of this particular certificate was not possible prior to trial, Alexis had ample opportunity to "discover" evidence of a similar probative force by completing inpatient treatment prior to trial. *See Waffle House, Inc.*, 313 S.W.3d at 813. Based on this record, we conclude the trial court did not abuse its discretion by denying Alexis's motion for new trial. *See id.* We overrule Alexis's final issue.

## V. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
6th day of July, 2023.

24